FILED

07/05/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2017 Session

**BRIAN DUNKLEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-B-1419    Steve R. Dozier, Judge**

_____

**No. M2016-00961-CCA-R3-PC**

_____

The Petitioner, Brian Dunkley, was convicted after a jury trial of conspiracy to commit first degree murder for his involvement in a plot to murder his wife. The Petitioner filed a post-conviction petition alleging that he received the ineffective assistance of counsel when his trial counsel failed to provide advice during plea bargaining, failed to challenge the State's loss or destruction of evidence, failed to suppress evidence on the basis of an invalid warrant, failed to suppress evidence on the basis of an invalid subpoena, and failed to introduce evidence regarding his location at the time of a co-defendant's arrest. After a hearing, the post-conviction court denied relief. We conclude that the Petitioner has failed to show that he received the ineffective assistance of counsel, and we accordingly affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Jodie A. Bell, Nashville, Tennessee, for the appellant, Brian Dunkley.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and Pamela Anderson and Megan King, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

**Trial**

The murder-for-hire plot came to light when Herman Marshall told law enforcement that his brother-in-law, co-defendant Donte Chestnut, had approached him with an opportunity to make $10,000 for committing a murder. *State v. Brian Dunkley*, No. M2012-00548-CCA-R3-CD, 2014 WL 2902257, at *1 (Tenn. Crim. App. June 25, 2014) *perm. app. denied* (Tenn. Nov. 20, 2014). The victim of the murder was to be Kristi Dunkley, who was married to the Petitioner but in the process of obtaining a divorce from him. *Id.* at *1, 9. Cooperating with law enforcement, Mr. Marshall made contact with co-defendant Stephanie Frame, who had been romantically involved with the Petitioner during his marriage and who was responsible for coordinating the murder. *Id.* at *2, 5-10. After Ms. Frame's arrest, she made a telephone call from jail implicating a third co-defendant, William Miller, who had attempted to carry out the murder plot prior to the involvement of Mr. Chestnut but had been unsuccessful in doing so. *Id.* at *4, 5-9.

Ms. Frame provided testimony regarding the conspiracy during trial. Her testimony was bolstered by numerous text messages taken from two telephones at issue on post-conviction: a T-mobile G-1 telephone and a "shadow phone," both of which belonged to Ms. Frame. *Id.* at *3-4. Law enforcement extracted data from the G-1 telephone and released it to Ms. Frame's mother shortly before the Petitioner's indictment. Ms. Frame testified, and the text messages and other evidence corroborated, that Ms. Frame and the Petitioner had plotted to kill the victim for a period of months. *Id.* at *5-10. The two enlisted Mr. Miller to commit the crime, providing him with a gun and giving him an advance payment of $700. *Id.* at *5-9. The balance of the payment to Mr. Miller was to come from certain life insurance policies. *Id.* at *6. Mr. Miller and Ms. Frame attempted to break open the door to the victim's apartment with a sledgehammer one night, and they damaged the door but were unsuccessful in opening it. *Id.* at *8-9. Mr. Miller subsequently became ill, and Ms. Frame turned to Mr. Chestnut for help in furthering the plot. *Id.* at *9. When Mr. Chestnut put her in touch with Mr. Marshall, she met him at the parking lot of Skyline Hospital and gave him a gun, a body suit, a hairnet, a can of pepper spray, and $200. *Id.* at *2. She also drove him to the victim's apartment so that he would know the victim's location. *Id.* Law enforcement were monitoring the meeting and saw a black Hummer drive around the hospital parking lot while Ms. Frame was speaking with Mr. Marshall. *Id.* at *5. Evidence was introduced that the Petitioner drove a black Hummer. *Id.* at *5, 8, 12. After Ms. Frame returned Mr. Marshall to the hospital, she was arrested. *Id.* at *3.

The text messages between the Petitioner and Ms. Frame were highly incriminating and included numerous references to the murder of the victim, including the Petitioner's texts that Ms. Frame should "Help me ... get rid of the bitch[,]" that his wife was on "borrowed time," and that she would be "taken out." *Id.* at *7, 20. The Petitioner communicated with Ms. Frame regarding the details of the victim's work schedule, the location of her vehicle, and other information bearing on accomplishing the

murder. *Id.* at \*6. The Petitioner and Ms. Frame also exchanged text messages about the more mundane and intimate details of their lives. In addition to the text messages pulled off of Ms. Frame's telephones, the prosecution introduced records obtained from telephone service providers for Ms. Frame's cell phone and for Mr. Chestnut's cell phone. Pursuant to a judicial subpoena, the prosecution also obtained from a service provider records related to two cell phones in the Petitioner's name. None of the records obtained from the service providers contained the substance of any communication between the parties. Instead, Ms. Frame's cell phones were the sole source of the substance of the numerous text messages between Ms. Frame's phones and the numbers belonging to Mr. Chestnut and the Petitioner. Ms. Frame testified at trial that the Petitioner actively deleted text messages from his cell phone because he was "'paranoid.'" *Id.* at \*11.

## Post-Conviction

At the post-conviction hearing, trial counsel testified that she was retained by the Petitioner in August 2010 and that trial was set for November 2010. She reviewed all of the discovery, including the text messages, and she met with the Petitioner several times. Trial counsel testified that she discussed the text messages with the Petitioner multiple times and that the Petitioner was aware of the content of the text messages. Trial counsel testified that she discussed the weight of the evidence, including the text messages, with the Petitioner but did not recall ever telling him that the State had a strong case against him. Trial counsel described the text messages as "damning." According to trial counsel, the Petitioner, who had previously worked for the State in the field of information technology and who was educated and intelligent, wanted to be exonerated and had always wanted to go to trial. Trial counsel discussed the Petitioner's exposure with him but did not recall ever recommending that he pursue a plea agreement. Neither did she ever express concern to his mother or to Joslynn Williams-Dunkley,[1] his girlfriend, regarding the strength of the State's case, because she did not want to affect their testimony in the event she chose to call them to testify.

According to trial counsel's testimony, on the morning of trial, she asked the Assistant District Attorney General about any offers to settle the case. Trial counsel stated that the prosecutor responded with an offer to recommend a sentence that was either at the bottom of the range for a Class A felony or the top of the range for a Class B felony in exchange for a guilty plea. Trial counsel spoke to the Petitioner about the offer

[1] Joslynn Williams was the Petitioner's girlfriend at the time of trial and is currently married to the Petitioner. Her affidavit reflects that she currently goes by the name Joslynn Williams-Dunkley, and we will refer to her as "Ms. Williams-Dunkley" in this opinion. The bulk of the testimony at the hearing referred to Ms. Williams-Dunkley as "Ms. Williams" to avoid confusion with the victim, who has in any event resumed her maiden name since the murder conspiracy.

for approximately five minutes. During this time, she did not discuss the strength of the State's case or the Petitioner's potential range of punishment. While trial counsel believed that entering a plea would be in the Petitioner's best interest, she did not share her opinion with him, make any recommendation regarding a plea, or ask for additional time to consider the offer in order to have a thorough discussion with the Petitioner. The Petitioner, with no guidance from trial counsel, responded he would consider serving a six-year sentence. The State promptly rejected this offer, and trial commenced.

According to trial counsel, Ms. Frame had two telephones with inculpatory evidence. Trial counsel tried to suppress the older text messages on the "shadow" phone based on Tennessee Rule of Evidence 404 and moved to dismiss the indictment and suppress evidence from the G-1 phone based the State's loss or destruction of evidence, pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). Trial counsel admitted that she had misunderstood the burden of proof regarding the *Ferguson* issue and did not present any evidence at the motions hearing. Trial counsel's motions were denied, and she re-filed the motions closer to trial. In preparation for the second hearing on the motion to suppress and motion to dismiss, trial counsel issued a subpoena to Ms. Frame's mother, directing Ms. Frame's mother to bring the G-1 telephone with her. The telephone was made available to the defense on the morning of the hearing. Trial counsel then struck the motions. At the post-conviction hearing, she agreed that the telephone had been in use and was not preserved by law enforcement. Trial counsel testified that she had been concerned regarding the destruction of voicemails and pictures but had never considered investigating the applications present on the telephone. She agreed that the Petitioner never specified what information on the telephone could have been helpful to him and that it was "pure speculation" and "essentially a fishing expedition" to assert that the telephone contained exculpatory information.

Trial counsel did not challenge the warrants for records related to Ms. Frame's two telephones or the judicial subpoena for the records related to the Petitioner's telephones. She agreed with the prosecution that the Petitioner would not have had standing to contest the warrants for Ms. Frame's telephones and that the State could have gotten new subpoenas if the subpoenas for the Petitioner's telephones had been found not to comply with statute. Ms. Frame's "shadow" telephone contained text messages which included pictures of the Petitioner sent from a number corresponding to one of his telephones, and trial counsel agreed that it would have been "extremely difficult" to challenge the premise that he was the one sending photos of himself.

Trial counsel's strategy was to shift the blame to Ms. Frame and to advance a theory that she had fabricated the text messages as a result of a delusional obsession with the Petitioner. Trial counsel testified that she could not recall whether she had known that the prosecution would introduce evidence that a Hummer was circling the parking lot

of the hospital while Ms. Frame met with Mr. Marshall. She recalled that the Petitioner wanted her to question his girlfriend, Ms. Williams-Dunkley, regarding the allegation. Trial counsel chose not to call Ms. Williams-Dunkley because the State possessed evidence calling Ms. Williams-Dunkley's credibility into question, including a civil judgment against her related to the sale of the Petitioner's Hummer, a finding from the divorce court that she had benefited from the Petitioner's liquidation of his 401K, and recorded calls to the jail in which she spoke with the Petitioner regarding keeping the Hummer. Trial counsel acknowledged that the records from the Petitioner's cell phone indicated that he was in Goodlettsville and not at Skyline hospital around the time of the meeting between Ms. Frame and Mr. Marshall.

Over the Petitioner's objection, Pamela Anderson, the Assistant District Attorney General who was representing the State at the post-conviction hearing, elected to testify. Ms. Anderson, who had prosecuted the Petitioner, stated that the prosecution had a strong case. Ms. Anderson testified that the State was entirely unwilling to allow any of the defendants on trial that day—Mr. Chestnut, Mr. Miller, or the Petitioner—to be severed from the other defendants, and she added that the State was not willing to entertain a plea to a reduced charge. We note that the Petitioner was charged with and acquitted of attempted aggravated burglary and attempted first degree murder. According to Ms. Anderson, the State never extended an offer to the Petitioner, and any plea negotiations would have been contingent on both the victim's approval and the entry of guilty pleas to the indicted offenses from all the other defendants on trial. Ms. Anderson agreed that the State "would have likely settled it" if the victim had agreed to the plea and if the other co-defendants had decided to plead guilty. Ms. Anderson stated that counsel for a co-defendant opened plea discussions on the day of trial. Ms. Anderson had told trial counsel that if the Petitioner were to offer to plead guilty to the indicted offense,[2] the State "might be willing" to agree to the minimum sentence in the Range. Ms. Anderson confirmed that trial counsel returned with a six-year offer, which the State rejected out of hand. She agreed with trial counsel that the trial judge in the case generally approved plea agreements reached by the parties.

Detective Norris Tarkington testified that Ms. Frame was arrested around 8:30 p.m. on March 2, 2009, and that he ultimately seized both the G-1 telephone and the "shadow" phone which she had used during the relevant period. One of the telephones was in Ms. Frame's possession, and he learned of the other while monitoring Ms.

---

[2] Ms. Anderson testified that the State would not have reduced the charges from the "indicted offense" and that if the Petitioner had offered to plead guilty to the "indicted offense," the State might have considered a fifteen-year sentence. She recalled that the Petitioner might have also been charged with attempted first degree murder and stated "we never got to any discussions about that." She clarified that the State would have considered a fifteen-year sentence in exchange for a guilty plea to a Class A felony.

Frame's telephone calls from jail. The second telephone was in the possession of Ms. Frame's mother, and after law enforcement retrieved information from the telephones, he returned one of them to Ms. Frame's mother.

Detective Tarkington testified that he could not find video surveillance of the Hummer in the parking lot because the cameras were too far away. He testified that Skyline hospital is in Nashville. Detective Tarkington testified regarding some of the communications between the Petitioner and Ms. Williams-Dunkley that would have affected her credibility. Ms. Williams-Dunkley had written the Petitioner, "I have got your back, baby," and told him, "I'm not blinded by love, I'm engulfed in it." Ms. Williams-Dunkley also wrote, "I want to harm someone like I've been harmed. I want to reach deep into someone's chest and pull out their pulsating heart from its rotting cavity," and she assured the Petitioner, "Revenge will be mine." She also referenced in a letter a plot that she and the Petitioner had concocted during a jail call, in which they planned to fabricate charges against the victim's uncle so that he would be arrested and the Petitioner could beat him up in jail.

The Petitioner, who had owned a consulting company and performed information technology work for the State of Tennessee prior to his conviction, hired trial counsel because his previous counsel, who represented him for four or five months, had not responded to his communications. The Petitioner testified that trial counsel never discussed his exposure or the State's theory of the evidence, including evidence that he stood to profit through the victim's death due to an insurance policy. The Petitioner had a prior criminal charge to which he pled guilty and for which he obtained diversion. He also had experience in divorce court. The Petitioner was aware that "there would be text messages," but trial counsel never reviewed the text messages line-by-line or discussed them. Trial counsel gave Petitioner the impression that the State had only screen shots of the text messages, that some of these did not have an identifying telephone number and were "outside the scope of the charges," and that the messages "wouldn't be anything to worry about" because they would not be admissible. Trial counsel also told him that the defense could discredit Ms. Frame's testimony. The Petitioner had the impression that trial counsel had "everything under control," and he had no concern that he would be found guilty. He did not see all of the text messages until trial, although his first attorney had given him two sheets of paper with some of the text messages on them. The Petitioner agreed that he was aware of the text messages because he had sent them. He also acknowledged that he actively deleted text messages off his own telephone and that the "majority" of the text messages introduced at trial were ones he had sent and received.

On the morning of trial, trial counsel told him "something about" fifteen years, but he thought that the fifteen-year sentence was part of Ms. Frame's plea agreement. He did

not think that the State had offered him a plea agreement, but he told trial counsel that he would agree to serve six years. The Petitioner testified that, if he had understood the State's case, he would have taken a plea offer of fifteen years. Trial counsel never suggested to him that he should plead guilty.

The Petitioner testified that the police failed to preserve the G-1 telephone. According to the Petitioner, the telephone could have contained an application giving the user the capability to modify text messages, and evidence of such an application on the G-1 telephone could have discredited Ms. Frame's testimony.

The Petitioner testified that he lived in Goodlettsville with Ms. Williams-Dunkley between January and April 2009 and that his home in Goodlettsville was located approximately ten miles from Skyline hospital. He was surprised at the testimony implying he was at the hospital during the meeting between Ms. Frame and Mr. Marshall, and he told trial counsel that he had been at home and that his vehicle had OnStar. He also told her that Ms. Williams-Dunkley could confirm that he had been at home and could confirm that he was not driving his Hummer at the time because she was using it. He acknowledged that Ms. Williams-Dunkley had written the statements read into the record by Detective Tarkington. The Petitioner acknowledged that he had been convicted of aggravated perjury for misrepresenting the fate of the Hummer in divorce court.

The post-conviction court denied relief. The post-conviction court credited trial counsel's testimony that she discussed the weight of the evidence with the Petitioner. The post-conviction court found that the State did not make a plea offer to the Petitioner and that the Petitioner was not therefore able to show deficiency or prejudice regarding the plea. The post-conviction court also found that trial counsel did not perform deficiently in seeking to suppress the telephone records pursuant to *Ferguson* and that the Petitioner had not shown that the data on the telephone was exculpatory and accordingly failed to show prejudice. The post-conviction court found that the search warrants for Ms. Frame's telephones were supported by probable cause and that the Petitioner had no standing to challenge them. The court concluded that the subpoenas were in compliance with statute and that trial counsel's decision not to call Ms. Williams-Dunkley was sound trial strategy. The post-conviction court denied the petition for post-conviction relief, and the Petitioner appeals.

## ANALYSIS

The Petitioner argues on appeal that he received the ineffective assistance of counsel when trial counsel failed to advise him to enter into a plea agreement, when trial counsel failed to challenge the admission of evidence pursuant to *Ferguson*, when trial counsel failed to challenge the search warrants related to Ms. Frame's telephone records,

when trial counsel failed to challenge the judicial subpoenas of the Petitioner's telephone records, and when trial counsel failed to introduce evidence contradicting the State's theory that he was circling the hospital parking lot in his Hummer. He also asserts he is entitled to relief under a theory of cumulative error.

A post-conviction petitioner must establish that his conviction or sentence is void or voidable due to the abridgment of any constitutional right. T.C.A. § 40-30-103. The petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f); *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward*, 315 S.W.3d at 465. This court may not substitute its own inferences for those drawn by the post-conviction court, and questions concerning the credibility of witnesses, the weight and value of the evidence, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). A claim of ineffective assistance of counsel raises a mixed question of law and fact which this court reviews de novo. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). The trial court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *Id.*

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to counsel. This right has been defined as the right to the "'reasonably effective'" assistance of counsel, or assistance "'within the range of competence demanded of attorneys in criminal cases.'" *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The overall standard of effectiveness is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting *Strickland*, 466 U.S. at 686).

In order to establish that he received the ineffective assistance of counsel, a petitioner must show both that his lawyer's performance was deficient and that the deficiency resulted in prejudice. *Pylant*, 263 S.W.3d at 868. Deficiency can be shown if the petitioner demonstrates that his attorney's services were below an objective standard of reasonableness under prevailing professional norms. *Id.* A petitioner must demonstrate deficiency by "'showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland*,

466 U.S. at 687). A reviewing court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 277. The court must presume that counsel's acts might be "'sound trial strategy,'" and strategic decisions, when made after a thorough investigation, are "'virtually unchallengeable.'" *Id.* (quoting *Strickland*, 466 U.S. at 689, 690).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, but for the errors, the result of the proceeding would have been different. *Grindstaff*, 297 S.W.3d at 216. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Honeycutt*, 54 S.W.3d at 768 (quoting *Strickland*, 466 U.S. at 694). "[T]he Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007).

A claim may be denied for failure to prove either deficiency or prejudice, and a court need not address both prongs if the petitioner has failed to establish either deficiency or prejudice. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## I. Plea Negotiations

The Petitioner argues that trial counsel's failure to advise him to accept the State's plea offer or to ask for additional time to consider the offer was deficient and that he was prejudiced by the deficiency because he received a sentence of twenty-five years after his conviction. The State responds that the Petitioner cannot demonstrate prejudice because he was aware of the nature and strength of the State's proof, because no plea offer was ever made, and because any plea would have been contingent on third parties.

A petitioner has a right to the effective assistance of counsel in the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). During plea bargaining, trial counsel has the duty to promptly communicate and explain any plea offers extended by the prosecution. *Nesbit v. State*, 452 S.W.3d 779, 800 (Tenn. 2014). Trial counsel must provide the accused "'with competent and fully informed advice, including an analysis of the risks that the client would face in proceeding to trial.'" *Id.* (quoting *Burt v. Titlow*, 134 S. Ct. 10, 19 (2013) (Sotomayor, J., concurring)). An attorney should "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Tenn. Sup. Ct. R. 8, RPC 1.4. Counsel should advise the accused "of the choices that are available to him as well as the probable outcome of these choices." *Parham v. State*, 885 S.W.2d 375, 384 (Tenn. Crim. App. 1994); *see also* American Bar Association Standards for Criminal Justice 14-3.2 ("To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the

defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision"). Most pertinently, "[i]f counsel is convinced that the accused should accept a plea bargain agreement and plead guilty, counsel should recommend that the accused opt for this choice" and counsel may use "reasonable persuasion" to convince the defendant. *Parham*, 885 S.W.2d at 384.

The Petitioner's testimony was that he did not know that the State had conveyed a plea offer. While trial counsel testified that she conveyed a plea offer to the Petitioner, the prosecutor testified that there was never an offer made by the State, and the trial court accredited the prosecutor's testimony. The Petitioner objects to this testimony and argues that the post-conviction court should not have permitted the prosecutor to testify. The Petitioner cites to Rule 3.7 of the Tennessee Rules of Professional Conduct for the proposition that "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless" the testimony relates to an uncontested issue or to the nature and value of legal services rendered in the case, or unless the lawyer's disqualification would result in substantial hardship to the client. Tenn. Sup. Ct. R. 8, RPC 3.7. The Petitioner asks us to discount the prosecutor's testimony, noting that the prosecutor was aware prior to the hearing that trial counsel's recollection was that the State had extended a plea offer. While the Petitioner has cited authority for the proposition that the prosecutor's decision to serve as the attorney for the State at the hearing and also as a witness may have been improper, the Petitioner cites to no authority that the testimony was inadmissible as a result. We note that a violation of this Rule generally results in the disqualification of the attorney from representing a party. *See, e.g.*, *Martha Elaine Weaver Carter v. David Ray Carter*, No. M2013-00193-COA-R3-CV, 2013 WL 5568360, at *3 (Tenn. Ct. App. Oct. 7, 2013). The comment accompanying the Rule notes that "[t]he opposing party has a proper objection where the combination of roles may prejudice that party's rights in the litigation." Tenn. Sup. Ct. R. 8, RPC 3.7, cmt. [2]. The Petitioner cites to no prejudice arising from the prosecutor testifying regarding her recollection of the plea negotiations, and the trial court chose to admit the testimony. We accordingly conclude that the testimony of the prosecutor is properly before this court.

Trial counsel's recollection was that the State made a plea offer which she conveyed to the Petitioner. However, her testimony was that she offered the Petitioner no advice regarding any offer, despite her assessment of the State's proof as particularly strong and her belief that pleading guilty in exchange for a fifteen-year sentence would be in the Petitioner's best interest. During a five-minute discussion in which trial counsel conveyed the State's offer without any advice, the Petitioner indicated he would plead guilty in exchange for a six-year sentence. The post-conviction court found that no plea offer was extended by the State, but the parties agree that the State was willing to consider recommending a fifteen-year sentence in exchange for a guilty plea and that trial

counsel offered the Petitioner no advice during her discussion with him, despite her opinion that he would benefit from the bargain. Given the standards outlined above, trial counsel's failure to offer any advice during plea negotiations was deficient.

When a petitioner claims prejudice from the failure to properly communicate a plea offer, "the petitioner must show that there is a reasonable probability that he or she would have accepted the plea had it been properly communicated to him or her." *State v. Garrison*, 40 S.W.3d 426, 431 (Tenn. 2000). More specifically, the petitioner must show (1) that he or she "would have accepted the plea"; (2) that "the prosecution would not have withdrawn the offer"; and (3) that "the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed." *Nesbit*, 452 S.W.3d at 800-01 (citing *Lafler*, 566 U.S. at 164). The United States Supreme Court, in *Lafler*, delineated that the prejudice inquiry should address whether "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)." *Lafler*, 566 U.S. at 164.

We conclude that the Petitioner cannot show prejudice on his claim. First, the Petitioner has not shown that the State actually made him an offer to reject. The post-conviction court credited the prosecutor's testimony that no offer was extended. Even if the Petitioner argues that trial counsel's deficiency consists of failing to persuade him to make the State an offer to plead guilty to the indicted offenses and serve fifteen years, the Petitioner cannot show prejudice. This is because the prejudice inquiry directs the court to determine whether there is "a reasonable probability that the plea offer would have been presented to the court." *Lafler*, 566 U.S. at 164; *see Garrison*, 40 S.W.3d at 431-32 (concluding that there was no prejudice in failure to communicate a plea offer because the evidence indicated that the petitioner would have rejected the offer). Here, the Petitioner introduced proof that the State would have considered accepting a plea to the indicted offenses and would have recommended the minimum sentence. The evidence also showed that one of the co-defendants had expressed an interest in a plea agreement. However, the prosecutor's testimony established that the State's acceptance of any plea would have been contingent on the approval of the victim and on an offer to plead guilty to the indicted offenses from both the co-defendants who were being tried contemporaneously with the Petitioner: Mr. Chestnut[3] and Mr. Miller. The Petitioner introduced no proof that the second co-defendant or that the victim would have agreed to the plea agreements. Accordingly, he has failed to show a reasonable probability that the

---

[3] The trial record establishes that Mr. Chestnut was present at trial and convicted of conspiracy to commit first degree murder. Mr. Chestnut was not a party to the direct appeal.

plea offer would have been presented to the trial court, and he cannot demonstrate prejudice.

## II. *Ferguson* Challenge

The Petitioner argues that trial counsel was deficient in failing to suppress the text messages based on the State's loss or destruction of evidence. After the State had extracted information from both of Ms. Frame's telephones, law enforcement returned the G-1 telephone to Ms. Frame's mother. Trial counsel filed the initial *Ferguson* motions in November but, misunderstanding the burden of proof, she introduced no evidence at the hearing on the motions, and the motions were denied. Trial counsel then filed subsequent motions relating to the loss of the G-1 telephone. She struck these motions, explaining that she had subpoenaed Ms. Frame's mother and stepfather and that they had produced the G-1 telephone on the morning of the hearing. She acknowledged that the motions were a "fishing expedition" and that the theory that the G-1 telephone contained additional exculpatory data was "speculation." The Petitioner argues that the majority of the incriminating text messages came from the G-1 telephone and that the Petitioner was prejudiced by trial counsel's failure to adequately litigate the issue. The Petitioner's theory on post-conviction appears to be that Ms. Frame could have used an application to alter the text messages and that this application could have been discovered by a thorough examination of the cell phone. The post-conviction court found that counsel "effectively argue[d]" the motion and that the Petitioner failed to introduce evidence that the phone contained exculpatory evidence.

The post-conviction court found that trial counsel did not perform deficiently because she raised the *Ferguson* issue. Trial counsel did not introduce proof on the issue during the first hearing, and the motion was denied. The motion was based on alleged photographs, images, voicemails, and call logs which had not been downloaded by the State during the data extraction. We note that the record is not exactly clear regarding the events surrounding the second motion, but it appears that trial counsel struck the motion when the G-1 telephone was made available to the defense. The Petitioner does not argue that trial counsel was deficient in not testing the G-1 telephone once it was made available. Neither does the Petitioner allege that the G-1 telephone was missing data at the time that it became available to the defense. The record does not preponderate against the finding that trial counsel did not perform deficiently because she raised the loss of the G-1 telephone as an issue and apparently obtained the G-1 telephone for inspection prior to trial.

The post-conviction court likewise concluded that the Petitioner had not established prejudice. To prove prejudice, the Petitioner would have had to prove a reasonable probability that effectively litigating a *Ferguson* issue would have changed

- 12 -

the outcome of the trial. *William Thomas Mayers v. State*, No. M2014-01704-CCA-R3-PC, 2016 WL 1268515, at *7 (Tenn. Crim. App. Mar. 31, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016) ("In order to determine prejudice, we must consider whether the Petitioner's *Ferguson* issue has merit."); *Kearn Weston v. State*, No. W2015-00460-CCA-R3-PC, 2016 WL 1223325, at *4 (Tenn. Crim. App. Mar. 29, 2016) *no perm. app. filed* ("Because a motion to dismiss, even if filed, would not have been successful, Petitioner has failed to show that he was prejudiced by trial counsel's failure [to move to dismiss pursuant to *Ferguson*]."). Accordingly, the prejudice inquiry is related to the merits of any *Ferguson* motion.

When the State's actions result in the loss or destruction of potentially exculpatory evidence, the court must determine whether a trial conducted without that evidence would be fundamentally fair. *Ferguson*, 2 S.W.3d at 914. As a preliminary step in evaluating the fundamental fairness of a trial held without the lost or destroyed evidence, the court must determine whether the State had a duty to preserve the evidence. *Id.* at 917. The State generally has a duty to preserve evidence subject to discovery under Tennessee Rule of Criminal Procedure 16 or other law. *Id.* However, the State's constitutional duty to preserve evidence is limited to evidence which is constitutionally material, that is, evidence which might be expected to play a significant role in the defense. *Id.* at 917 (citing *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). "'[E]vidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* (quoting *Trombetta*, 467 U.S. at 489). Evidence need not be clearly exculpatory; even evidence which has "tenuous" exculpatory value and which is "probably of marginal exculpatory value" may give rise to a duty to preserve, so long as it was material to the preparation of the defense and might have given rise to reasonable doubt regarding guilt. *Id.* at 918. Accordingly, the evidence need not be apparently exculpatory but only have "potential exculpatory value." *State v. Merriman*, 410 S.W.3d 779, 792 & 785 n.3 (Tenn. 2013) (concluding that evidence which could have been beneficial to the defense or the State was potentially exculpatory). The Tennessee Supreme Court has recognized "the difficulty in defining the boundaries of the State's duty to preserve evidence when its true nature, whether exculpatory, inculpatory, or neutral, can never be determined." *Id.* at 785.

If the court finds that the State had a duty to preserve the destroyed evidence, then the court evaluates (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of other evidence. *Ferguson*, 2 S.W.3d at 917.

- 13 -

The Petitioner's theory on post-conviction is that the G-1 telephone could have contained an application which would have permitted Ms. Frame to fabricate text messages, and that the existence of this hypothetical application would have undermined the corroborating evidence involving him in the plot. However, the Petitioner has presented no evidence, beyond his own testimony, that such an application existed and no evidence at all that such an application was present on Ms. Frame's cell phone. On the contrary, he acknowledged that the "majority" of the text messages were ones he had sent or received. Moreover, trial counsel was ultimately able to obtain the lost G-1 telephone, and the Petitioner makes no allegation that the G-1 telephone was tainted at the time that he obtained it. *See John Darryl Williams-Bey v. State*, No. M2005-00709-CCA-R3-PC, 2006 WL 2242263, at \*6 (Tenn. Crim. App. Aug. 4, 2006) (post-conviction petitioner was not entitled to relief because he failed to prove the existence of fingerprints present on a vehicle which law enforcement had returned to victim and the absence of fingerprints would have been only marginally helpful). While the information on the telephone may have been material, it was substantially preserved during the data extraction, and the Petitioner acknowledged that the text messages would have been present on his own telephone had he not actively deleted them. *See State v. Michael Orlando Freeman*, No. E2014-02054-CCA-R3-CD, 2016 WL 912160, at \*14 (Tenn. Crim. App. Mar. 10, 2016) *no perm. app. filed* ("We find it dubious that the Defendant should fault the State for failing to preserve evidence which he himself also failed to safeguard."). Furthermore, the "shadow" telephone also contained numerous incriminating test messages which established the Petitioner's participation in the plot. Accordingly, the Petitioner also cannot demonstrate prejudice.

### III. Search Warrants

The Petitioner next asserts that trial counsel should have challenged the search warrants related to Ms. Frame's telephones. The Petitioner, however, concedes in his brief that he cannot show deficiency or prejudice on this issue based on lack of standing to challenge the warrants. Instead, he asserts that this evidence should have spurred trial counsel to negotiate a plea agreement. Accordingly, we conclude that the Petitioner is not entitled to relief based on trial counsel's failure to file a motion to suppress these records, and we have already determined above that the Petitioner has not demonstrated prejudice from trial counsel's failure to advise the Petitioner to extend a plea offer to the State.

### IV. Judicial Subpoenas

The Petitioner argues that trial counsel was deficient in not moving to suppress the evidence based on the assertion that the judicial subpoenas used to obtain the Petitioner's cell phone records did not comply with statute. The State counters that the subpoenas

complied with the statute, and that even if they did not, the State could have obtained new subpoenas so that any challenge would have been futile. The post-conviction court found that the subpoenas complied with statute and that the data from the phones as well as the Petitioner's testimony established that the phones belonged to him.

We agree with the Petitioner that the post-conviction court's finding that the telephones contained the Petitioner's private information and therefore actually belonged to the Petitioner does not bear on whether the subpoenas were properly issued or whether the failure to challenge them was prejudicial.

Under Tennessee Code Annotated section 40-17-123(a), a law enforcement officer may obtain a subpoena for the purpose of investigating or gathering evidence to prosecute a criminal offense:

> An affidavit in support of a request to compel the production of books, papers, records, documents, tangible things, or information and data electronically stored shall state with particularity the following:
>
> (1) A statement that a specific criminal offense has been committed or is being committed and the nature of the criminal offense;
>
> (2) The articulable reasons why the law enforcement officer believes the production of the documents requested will materially assist in the investigation of the specific offense committed or being committed;
>
> (3) The custodian of the documents requested and the person, persons or corporation about whom the documents pertain;
>
> (4) The specific documents requested to be included in the subpoena; and
>
> (5) The nexus between the documents requested and the criminal offense committed or being committed.

T.C.A. § 40-17-123(c).

While only one of the subpoenas was made an exhibit at the post-conviction hearing, the State stipulated that the exhibits attached to the post-conviction petition, with the exception of the affidavits, should be part of the record, and both subpoenas were attached to the petition. The Petitioner challenges the subpoenas for two cell phones belonging to him: one beginning with the area code and the number "491" and one

beginning with the area code and the number "477." The Petitioner argues that neither affidavit was sufficiently particular.

The State asserts that the Petitioner cannot show prejudice because, had the trial court found the affidavits to be insufficiently particular, the State could have simply obtained subsequent subpoenas that complied with the statute. The Petitioner does not dispute this. Moreover, the Petitioner cannot demonstrate a reasonable probability that the outcome of the proceeding would have been different even if the records had been suppressed. At trial, the State introduced the recorded conversations between Ms. Frame and Mr. Marshall to show that Ms. Frame was attempting to hire Mr. Marshall to murder the victim. Mr. Marshall's testimony and the gun and other items Ms. Frame gave him were also introduced at trial. Ms. Frame testified that she attempted to procure the murder at the behest of the Petitioner, who was in the process of divorcing the victim. Ms. Frame's cell phone records were the source of the corroborating information which trial counsel described as "damning." The records extracted from Ms. Frame's G-1 and "shadow" phones contained the substance of numerous text messages in which the Petitioner solicited or referenced the murder of his wife. The records obtained from Ms. Frame's service provider confirmed many points of contact between her telephone number and the Petitioner's. The Petitioner's subpoenaed telephone records did not reveal the substance of any written or oral communication but only confirmed that his telephone had been involved in points of contact with Ms. Frame's telephone number. This evidence, which was largely already confirmed through Ms. Frame's service provider, was of marginal value at trial. Accordingly, the Petitioner cannot show prejudice.

### V. Evidence Regarding Petitioner's Location

The Petitioner next faults trial counsel's failure to emphasize proof in the record or elicit witness testimony which would have called into question the State's theory that he circled the hospital parking lot in his Hummer while Ms. Frame met with Mr. Marshall.

The Petitioner asserted at the hearing that Ms. Williams-Dunkley could have testified to his whereabouts and to the fact that he was not driving his Hummer because he had made it over to her use. Trial counsel noted that she had cross-examined the State's witnesses to establish that the vehicle was popular, and she stated that there had been some evidence in the telephone records that the Petitioner's telephone was using a cellular tower in Goodlettsville, which is located a few miles north of Skyline hospital. She testified that she did not call Ms. Williams-Dunkley due to Ms. Williams-Dunkley's credibility issues, which were then detailed by Detective Tarkington. The post-conviction court found that the decision not to call Ms. Williams-Dunkley was reasonable

- 16 -

trial strategy and that the telephone records documenting the Petitioner's location were before the jury.

When a claim of ineffective assistance of counsel is premised on counsel's failure to interview or call witnesses, the witnesses must be presented at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "'As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" *Pylant*, 263 S.W.3d at 869 (quoting *Black*, 794 S.W.2d at 757). This is because the court cannot speculate as to what a witness's testimony might have been. *Black*, 794 S.W.2d at 757. Presenting the witness allows the post-conviction court to determine whether that witness's testimony would have been credible, material, and admissible. *Pylant*, 263 S.W.3d at 869-70.

The Petitioner has failed to demonstrate that he was prejudiced when trial counsel chose not to call Ms. Williams-Dunkley because Ms. Williams-Dunkley did not testify at the post-conviction hearing. We note that the post-conviction court found that there was no deficiency because Ms. Williams-Dunkley's testimony would have led to the introduction of corollary evidence regarding her credibility and her plot to falsely imprison the victim's uncle. We conclude that the finding that refusing to call Ms. Williams-Dunkley was sound trial strategy is supported by the record.

The Petitioner argues that trial counsel also "failed to emphasize proof" that he was not at the hospital, presumably referring to the telephone records which could have led to an inference that he was a few miles north of the hospital. However, the Petitioner cannot demonstrate prejudice on this claim. First, we note that while the records from trial indicated that one of the Petitioner's telephones was using a cellular tower located in Goodlettsville close to the time of Ms. Frame's arrest, the testimony at trial also established that a cellular telephone would not always use the closest tower and that use of a cellular tower could not establish location with any precision.

Moreover, the Petitioner's presence at or absence from the hospital was not material to his prosecution; instead, his conviction was based on the testimony of Ms. Frame and the numerous text messages indicating his desire to have his wife murdered and his solicitation of others to achieve that end. Even if trial counsel could have shown that the Petitioner was not at the hospital during the meeting, there is no reasonable probability that the results of the proceeding would have been different.

**VI. Cumulative Error**

- 17 -

The Petitioner also asserts that the cumulative effect of trial counsel's errors denied him a fair trial. The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). The doctrine of cumulative error only applies when there has been more than one error committed during trial. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). Because we have determined that trial counsel's deficient conduct was limited to the failure to advise the Petitioner regarding a potential plea, the Petitioner is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE